31 F.3d 1179
 39 ERC 1146, 308 U.S.App.D.C. 172, 63
USLW 2148,
24 Envtl. L. Rep. 21,363
 SANTA BARBARA COUNTY AIR POLLUTION CONTROL DISTRICT, Petitioner,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY; Carol M. Browner,
Administrator, U.S. Environmental Protection
Agency, Respondents.
Western States Petroleum Association, Intervenor.
 No. 92-1569.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 10, 1994.
Decided Aug. 12, 1994.
 
 William M. Dillon, Santa Barbara, CA, argued the cause, for petitioner. With him on the briefs was Stephen Shane Stark, Santa Barbara, CA.
 Jon M. Lipshultz, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause, for respondents. With him on the brief were Lois J. Schiffer, Acting Asst. Atty. Gen., and Jan M. Tierney, Atty., E.P.A., Washington, DC. Jill E. Grant, Atty., E.P.A., Washington, DC, entered an appearance, for respondents.
 Donna R. Black, Los Angeles, CA, of the bar of Cal., pro hac vice, by special leave of court, argued the cause, for intervenor. With her on the brief was Bradley R. Hogin, Los Angeles, CA.
 Before BUCKLEY, WILLIAMS, and GINSBURG, Circuit Judges.
 Opinion for the court filed by Circuit Judge BUCKLEY.
 Concurring opinion filed by Circuit Judge STEPHEN F. WILLIAMS.
 BUCKLEY, Circuit Judge:
 
 
 1
 The County of Santa Barbara Air Pollution Control District ("Santa Barbara" or "County") challenges the Environmental Protection Agency's regulations governing air pollution from sources on the Outer Continental Shelf ("OCS"). We uphold the EPA's regulations insofar as they refuse regulation of in-transit maritime vessels as OCS sources; we conclude, however, that the Act requires that OCS sources within 25 miles of shore be subject to offset requirements identical to those applicable to sources in the corresponding onshore area. We vacate the regulations insofar as they do not provide for such treatment.
 
 I.
 
 2
 In 1990, Congress assigned the EPA the responsibility for controlling air pollution produced over extensive areas of the OCS. Congress did so by adding section 328 to the Clean Air Act, 42 U.S.C. Secs. 7401 et seq. (1988 & Supp.1990) ("Act"). See 42 U.S.C. Sec. 7627 (Supp. II 1990). Subsection (a)(1) of section 328 requires the Administrator of the EPA to
 
 
 3
 establish requirements to control air pollution from Outer Continental Shelf sources [within such areas] to attain and maintain Federal and State ambient air quality standards and to comply with the provisions of part C of subchapter I of this chapter. For such sources located within 25 miles of the seaward boundary of such States, such requirements shall be the same as would be applicable if the source were located in the corresponding onshore area, and shall include, but not be limited to, State and local requirements for emission controls, emissions limitations, offsets, permitting, monitoring, testing, and reporting.
 
 
 4
 Id. Sec. 7627(a)(1). Subsection (a)(4) defines OCS sources as follows:
 
 
 5
 (C) Outer Continental Shelf source. The terms "Outer Continental Shelf source" and "OCS source" include any equipment, activity, or facility which--
 
 
 6
 (i) emits or has the potential to emit any air pollutant,
 
 
 7
 (ii) is regulated or authorized under the Outer Continental Shelf Lands Act ..., and
 
 
 8
 (iii) is located on the Outer Continental Shelf or in or on waters above the Outer Continental Shelf.
 
 
 9
 Such activities include, but are not limited to, platform and drill ship exploration, construction, development, production, processing, and transportation. For purposes of this subsection, emissions from any vessel servicing or associated with an OCS source, including emissions while at the OCS source or en route to or from the OCS source within 25 miles of the OCS source, shall be considered direct emissions from the OCS source.
 
 
 10
 Id. Sec. 7627(a)(4)(C).
 
 
 11
 Responding to its new obligations, the EPA published a proposed OCS rule in late 1991, Outer Continental Shelf Air Regulations--Proposed Rule, 56 Fed.Reg. 63,774 (1991), and a final rule on September 4, 1992. Outer Continental Shelf Air Regulations--Final Rule, 57 Fed.Reg. 40,792 (1992). Santa Barbara contends that the final rule contravenes section 328 in two respects: First, it fails to include marine vessels in transit among OCS sources; second, its air pollution offset provisions do not treat OCS sources within 25 miles of the shore in the same manner that corresponding onshore sources are treated.
 
 II.
 
 12
 Section 307 of the Clean Air Act states that a court "may reverse any [action of the Administrator that is] found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right...." 42 U.S.C. Sec. 7607(d)(9)(C) (1988). Our review of the EPA regulations follows the familiar Chevron analysis:
 
 
 13
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, ... the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 14
 Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (footnotes omitted).
 
 A. Regulation of Marine Vessels
 
 15
 Each party argues that Congress has directly spoken to the "in transit" issue and that the text of section 328 unambiguously supports its position. Thus the County argues that the EPA's construction is owed no deference, while the EPA asserts that none is necessary. The County contends that the language of subsection (a)(1) requires the Administrator "to control air pollution from Outer Continental Shelf sources," which it interprets to include marine vessels in transit, in the same manner as "if the source were located in the corresponding onshore area." 42 U.S.C. Sec. 7627(a)(1). The EPA, on the other hand, maintains that the definition of OCS source in subsection (a)(4)(C) makes clear that marine vessels in transit are excluded. See id. Sec. 7627(a)(4)(C).
 
 
 16
 The County's position would be unassailable if vessels in transit were unambiguously included within the statutory meaning of "Outer Continental Shelf sources." Yet as the EPA points out, that phrase is defined in subsection (a)(4), which mentions vessels in only two contexts: "drill ship exploration" and
 
 
 17
 emissions from any vessel servicing or associated with an OCS source, including emissions while at the OCS source or en route to or from the OCS source within 25 miles of the OCS source, shall be considered direct emissions from the OCS source.
 
 
 18
 Id. Sec. 7627(a)(4)(C) (emphasis added). The definitional provision thus fails to make specific mention of vessels in transit. We do not find this silence to be dispositive; rather, we view the provision as ambiguous, at least insofar as the status of vessels in transit is concerned. The agency defines OCS source to include vessels only when they are:
 
 
 19
 (1) Permanently or temporarily attached to the seabed and erected thereon and used for the purpose of exploring, developing or producing resources therefrom, within the meaning of section 4(a)(1) of OCSLA (43 U.S.C. Sec. 1331 et seq.); or
 
 
 20
 (2) Physically attached to an OCS facility, in which case only the stationary source aspects of the vessels will be regulated.
 
 
 21
 40 C.F.R. Sec. 55.2 (1993). We find this to be a permissible reading of the statute: As section 7627 merely mentions vessels "servicing or associated with" an OCS source to ensure their emissions are included with those of the parent OCS source (when the vessel is within 25 miles of the source, and is en route to or from the source), we find it was reasonable for the EPA to conclude that OCS sources did not include vessels that were merely traveling over the OCS. We therefore accord the agency's interpretation the deference that it is due under Chevron.
 
 B. Offset Requirements
 
 22
 A key method for controlling air pollution without impeding new economic activity is through "offsetting." Under this strategy, the relevant air pollution control authority, whether it be the EPA or a state or local agency, will permit the creation of a new source of emissions only if the new polluter is able to secure an offsetting reduction in emissions from preexisting polluters at least equal to the amount of pollution the new source could potentially generate. See 40 C.F.R. Sec. 55.5(d) (1993). These reductions are not always on a one-for-one ratio. Santa Barbara, for example, enforces a base ratio of 1.2:1, such that for every ton of emissions a new facility will emit, it must acquire an offset of 1.2 tons. Moreover, the County also imposes a distance discounting factor whereby the offset ratio is increased as the distance between the offset source and the new source increases. The purpose of distance discounting is simply to create an incentive for new sources to obtain offsets from close-by sources rather than sources in other areas of the County.
 
 
 23
 Subsection (a)(1) states that, in dealing with air pollution from OCS sources within 25 miles of the shore, the EPA must promulgate
 
 
 24
 such requirements ... as would be applicable if the source were located in the corresponding onshore area, and shall include, but not be limited to, State and local requirements for emission controls, emission limitations, offsets, permitting, monitoring, testing, and reporting.
 
 
 25
 42 U.S.C. Sec. 7627(a)(1) (emphasis added). The regulations challenged here are those implementing the offset provision of this subsection and are codified at 40 C.F.R. Sec. 55.5(d)(3)-(5).
 
 
 26
 The EPA's offset regulations create three zones for the purposes of applying distance penalties: (1) seaward of the OCS source ("zone 1"); (2) the area between the OCS source and the state seaward boundary (which is three miles from the coast in California) ("zone 2"); and (3) the area from the state seaward boundary extending inland ("zone 3"). Offsets obtained in zone 1 are subject to all the offset requirements, including any distance discounts, of the Corresponding Onshore Area ("COA"), id. Sec. 55.5(d)(5), which is defined as "the onshore area that is geographically closest to the source or another onshore area that the Administrator designates as the COA, pursuant to Sec. 55.5 of this part." Id. Sec. 55.2. Offsets obtained in zone 2 are subject to the base ratio required in the COA, but not to its distance penalties. Id. Sec. 55.5(d)(3). Offsets obtained in zone 3 are also subject to all the offset requirements of the COA, including any distance penalties. Id. Sec. 55.5(d)(4). For purposes of calculating the distance between the OCS source and the source of offsets in zone 3, it is assumed that the OCS source is located at the state seaward boundary. Id.
 
 
 27
 The County makes a short but compelling argument that the EPA has departed from the Act's clear directive that the agency promulgate the same offset "requirements ... as would be applicable if the source were located in the corresponding onshore area." 42 U.S.C. Sec. 7627(a)(1). The EPA takes a more flexible approach, contending that onshore distance discounting rules are not readily applicable to offshore sources. The agency concludes that implementing the COA offset standards would undercut the purposes of the legislation by discouraging OCS sources from obtaining offsets from onshore sources due to the substantial disincentive imposed by the distance penalty. Yet the statute does not speak of affording similar regulatory treatment; instead, it explicitly calls on the agency to promulgate the same offset "requirements ... as would be applicable if the source were located in the corresponding onshore area." Id. While Congress's intent may have been misguided, we think it was clear, and thus the agency is bound to give it effect. Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. Because the agency's three-tiered structure accords only those OCS sources obtaining offsets from sources in zone 1 the same treatment as the County applied to sources located in the COA, we vacate the regulation insofar as it applies to offsets obtained from zones 2 and 3.
 
 III.
 
 28
 In light of the foregoing, we vacate the regulation in part, and remand it for further consideration in light of this opinion.
 
 
 29
 So ordered.
 
 
 30
 STEPHEN F. WILLIAMS, Circuit Judge, concurring:
 
 
 31
 I join most of the majority's opinion, but I write separately because the statutory treatment of offset requirements is more ambiguous than part II.B. might suggest.
 
 
 32
 * * *
 
 
 33
 After directing the Administrator of the EPA to "establish requirements to control air pollution from Outer Continental Shelf sources located offshore of the States", Congress specified that the requirements for OCS sources located within 25 miles of a state's seaward boundary "shall be the same as would be applicable if the source were located in the corresponding onshore area". 42 U.S.C. Sec. 7627(a)(1). This mandate obviously calls on the Administrator to determine the requirements that would apply if a source that is not located within a particular onshore area actually were located within that area. But there are two possible ways of approaching this task. One method is to imagine that the OCS source stays where it is, while the onshore area's boundaries expand to encompass it. The other method is to imagine that the onshore area's boundaries stay where they are, while the OCS source moves to some point within them.
 
 
 34
 Many of the state and local requirements that Congress had in mind have a uniform impact throughout the entire onshore area; that is, their application depends only on whether a source is located within the covered area, not on exactly where the source lies. Requirements of this sort (which include offset requirements that do not call for "distance discounting") can be extended to OCS sources without ambiguity, because their effect will be the same regardless of whether one imagines the onshore area's boundaries expanding to include the OCS source or the OCS source moving to within the boundaries. If an onshore area limits emissions of a certain pollutant, then nearby OCS sources face the same limitation. If onshore sources of the pollutant must file reports, then so must the OCS sources.
 
 
 35
 But offset requirements that call for "distance discounting" are different. The application of such requirements to any particular source depends on the source's precise location within the onshore area, and it is not immediately obvious how to apply such requirements to sources that are not really within the onshore area at all. For requirements of this sort, the distinction between the two possible approaches to Sec. 7627(a)(1) becomes crucial.
 
 
 36
 Under the first approach, the critical distance is that between the proposed OCS source and the source that will provide the offsetting reductions in pollution. Since "distance discounting" creates an incentive to minimize this distance, the operator of the OCS source might well seek to obtain his offset from another offshore source rather than a land-based one. In addition, he would be indifferent about whether the offset came from the seaward or the landward side of the proposed source.
 
 
 37
 Under the second approach, by contrast, the proposed OCS source would be treated as if it were really located somewhere in the corresponding onshore area--at Point X, say. Because the operator of the proposed source would thus have an incentive to find offsets from sources as close to Point X as possible, this approach would encourage pollution reductions at sources in or near the onshore area (where pollution is of the greatest concern) rather than near the proposed offshore source.
 
 
 38
 The EPA--the agency that Congress charged with implementing Sec. 7627(a)(1)--seems to favor the second set of incentives over the first. Offset requirements, after all, are designed to improve air quality within nonattainment areas like Santa Barbara County, and the EPA was concerned that "application of onshore offset requirements [to OCS sources] might unintentionally provide an incentive for an OCS source to obtain offsets far from the nonattainment area". In promulgating the rules at issue here, the agency asserted that they would respect "the underlying goals and technical rationale" of offset requirements by encouraging operators of OCS sources "to obtain their offsets from the landward side of the OCS source". 57 Fed.Reg. 40792, 40796 (Sept. 4, 1992).
 
 
 39
 Still, the regulations do not reflect any coherent interpretation of the EPA's statutory mandate to treat close-in OCS sources as if they were "located in the corresponding onshore area". In the area seaward of the OCS source ("zone 1"), the EPA takes the first approach, applying local distance discounts as if the onshore area had expanded to include the Outer Continental Shelf. But when it comes to the area extending inland from the imaginary line 3 miles off the California coast ("zone 3"), the EPA effectively takes the second approach, applying local distance discounts as if the OCS source had moved to a point on that imaginary line.[1] (To judge from comments at oral argument, this line apparently marks the boundary of the "onshore" area.) As for the intermediate area ("zone 2"), the EPA does not apply local distance discounts at all; this treatment--which has the same effect as pretending that both the proposed and the offset sources have been moved to a single point within the onshore area--does not seem to fit either approach.
 
 
 40
 While we owe deference to the EPA's reasonable interpretation of Sec. 7627(a)(1), see Chevron USA v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the EPA must make such an interpretation; it cannot adopt an amalgam of reasonable but conflicting interpretations, nor can it simply ignore its statutory mandate in favor of what it considers a more rational policy. I therefore agree with the majority that the EPA's treatment of offset requirements for OCS sources is invalid. But I do not think that the statute requires the EPA to extend its treatment of zone 1 to the entire area; in my view, the agency could equally well extend its treatment of zone 3 (or some similar means of pretending that the OCS source has moved within the corresponding onshore area). Both approaches to the statute seem permissible to me, and it is up to the EPA to choose between them.
 
 
 
 [1]
 Santa Barbara points out that there may be more than one such point. This observation raises a question about how the regulation would be applied, but it does not prove that the regulation is invalid